case today we hear is In Re Remicade appellate number 18-3567. And I thank everyone for their patience as I move those motions. May it please the court, William Cavanaugh on behalf of appellant and I would reserve two minutes for rebuttal. I'd be granted. Your honor, thank you. You're welcome. The district court erred in failing to find frankly the most broadly worded phrase found in our case law calling for any controversy or claim arising from or relating to Rochester's contract with Janssen is susceptible of an interpretation that RDC's antitrust claims are subject to arbitration. How is it related? It is related in that every purchase of Remicade made by Rochester was made pursuant to the terms of the distribution agreement. Janssen agreed to sell under this agreement Remicade to RDC pursuant to Janssen's published WAC price. What that means is that if Janssen had tried to charge Rochester more, Rochester could have pointed to the contract. If Rochester attempted to pay less, Janssen could have pointed to the contract. The contract involved here dealt exclusively with Remicade if I'm not mistaken. That's correct, your honor. But the antitrust claims involve other drugs in Flextra and Renflexes. Your honor, that's true. The claim in this case is that Remicade Janssen was a monopolist with over a 90% market share and dominated the market. Their claim is for overcharges on Remicade. In other words, their claim is that the WAC price provided for in their contract was overcharged as a result of an antitrust violation. But they have antitrust claims that do not relate to the drug which is the subject of the arbitration. Those drugs are separate in Flextra and Renflexes. Well, your honor, I would say that they all flow from the anti-competitive conduct which involves an overcharge on Remicade which they allege had a 90% market share. That doesn't make claims related to Remicade un-arbitrable. They certainly are arbitrable. I would say that's fine. That's part of the arbitration agreement. But they are making claims for separate drugs. They are, your honor. That's not an issue that has really come up in terms of whether that should be arbitrated or not arbitrated. Well, they're saying here that it should be. I believe it should be. It should not be arbitrated. I'm sorry. No, I believe it should be because I believe it still relates to the overcharge claims that have been made here and it is that course of conduct. Now How does it relate to it? Explain. Pretend we were arguing in front of a jury and you were trying to explain to the jury how the charges on non-Remicade products relate to this agreement and affect the antitrust injury your adversary says they sustained. Sure. It relates to it in the sense that the allegation is that Janssen was a monopolist. All of their purchases of Remicade were pursuant to this agreement. There is a small percentage of claims that they say, well, even the biosimilars, which they say have been disadvantaged by virtue of Janssen's conduct, have some sort of overcharge. In my experience, that's not how these cases typically go, but here, those claims still arise out of the overcharge. Arise out of or relate to? I would say relate to, which is certainly, which this Court has recognized is a somewhat broader term than arises from. However, arises from is still in the course of the ongoing relationship. But you're not basing this, I thought, on the business relationship. I thought your argument was that because there's an emphasis on the price, necessarily, and that relates specifically to damages, that that's a way that you can pull in cases like JLM or EPICS, that it really comes down to damages and the reference to price within the contract. Well, I would agree that that is the most direct relationship between the antitrust claims here and the contract. However, the contract does govern an overall relationship that existed. Well, it does, but that would be true of every single contract that had an arbitration clause. I mean, wouldn't that devolve into a but-for test? Not really, Your Honor, because it still involves purchases. These purchases were made pursuant to this contract. We're not here arguing about an automobile accident that happened between an employee of Rochester and an employee of Janssen. These are all purchases that were made pursuant to this contract. Now, I would agree with you, certainly, that the price question is a fundamental question here. So let's talk about the price question, because in other circuits, to the extent there has been any reliance on price, or even in EPICS, it's been a specific price. Well, Your Honor, this is a specific price. It's the published WAC price. And as I said a moment ago, that's an enforceable contractual term. If Janssen had tried to charge Rochester more than the published WAC price, Rochester would have said, you can't do that. We haven't agreed upon price. So let's talk about how the pricing structure works in this agreement. Sure. The agreement has the language of the wholesale acquisition cost. And as I understand it, that price will change during the course of the distribution relationship. That is correct. So do you use that sort of as a shorthand to say, whatever the price is at the time of the distribution? Because even in the Schedule B, you have an understanding of when you have to adjust those prices, right? Yes, because WAC is a published price. It's available. And frankly, the WAC price didn't, it goes beyond the record, didn't change much during this period of time once the biosimilars came out. But the question is, there is a reference price. The district court said, well, it's not a specific price. It is a specific price. It's a published WAC price. It's contractually enforceable. And their overcharge claim, their antitrust overcharge claim, is that that price was inflated by virtue of the anti-competitive conduct. And their damage claim is going to be, it's the difference between the published WAC price and absent the anti-competitive conduct, what the lower price should have been. That directly relates to the contract. Did that price take into account the other two drugs that we mentioned before, Inflectra and Ranflexus? Well, to the extent our price was based on looking at competitive considerations and the availability of biosimilars, it would have taken it into consideration, Your Honor. Would have or it did? Well, it did to the extent that any competitive entrant would look at, what are my competitors pricing at? It's certainly not a formulaic issue. It's the WAC price for Remicade. Would there be a different price for the two products that Judge Fuentes just asked you about? There were different prices. Ranflexus and Inflectra, sold by competitors, set their own price. So your product, your client's product is Remicade? Correct. The other two products are sold by some other entity? Pfizer and Merck sell the other two products. So when we were painting a picture for a jury, the jury would be edified as to the Remicade price and then the competitor's price and your adversary would presumably try to explain why these prices are impacted by the rebates, et cetera. Yes, but by what they allege is the anti-competitive conduct. And their theory is the biosimilars couldn't get out there. They have a, according to them, a minuscule market share. But the question is, are they arbitrable claims or not? Well, certainly as to Remicade. Are they envisioned in the arbitration agreement? I shouldn't say envisioned. Are they incorporated in the arbitration? Certainly as to Remicade, they are. OK. As to the other two products for which there will be, I would say they still relate to the agreement. It's a controversy that principally involves Remicade. And to the extent that these two, that sales of the biosimilar, I would say sufficiently relate to the dispute involving Remicade that they would still fall within the scope of this agreement. Is that because they are two types of products that would be competitive in the marketplace and therefore affect the price of Remicade? Yes, Your Honor. And those are the products that they allege are the direct competitors that are being adversely impacted by what my client allegedly has done with respect to Remicade. To the extent there is a. Let's talk about the legal standard that governs how we evaluate what is swept into this clause. I noticed at the outset you went right into the relationship in pricing. Are you conceding in light of cases like first options and moon be breathless that we are looking to state and not federal law at this point? No, Your Honor. This should be governed by federal common law under century indemnity. Scope is governed by federal law. In moon, the party stipulated that scope could be decided, should be decided under state law. What about Arthur Anderson, which tells us to deal with arbitration clauses in light of general principles of state law? Century doesn't talk about Arthur Anderson, even though it was decided after Arthur Anderson. I understand, Your Honor. And I would say that that is an issue when the court says the court mentioned in CardioNet that you look to ordinary principles of contract construction. I would agree with that. You look at the plain meaning. And here, the plain meaning of any controversy or claim relating to the underlying contract is a broad phrase as multiple courts, including this court, has recognized. That's an issue that should be subject to, as the Supreme Court has said, any colorable reading, any susceptible interpretation. What New Jersey has done. It sounds like you're conceding that we interpret this arbitration agreement under state law. No, Your Honor, I'm not. What century indemnity says and the two other case third circuit cases it cites say it's a matter of federal common law. You can look to ordinary principles of contract construction. But, for example, here, New Jersey has taken a divergent path limited to, I would argue, consumer and employment cases in looking in frankly, looking at arbitration through the lens of, is it a waiver of rights? Are they really doing that, though? Isn't it? Isn't it true that the New Jersey Supreme Court, in looking at this clear and unequivocal or unmistakable language you need for a waiver, observed in at least that that standard is used outside the arbitration context. So how can you say that New Jersey has imposed some additional requirement that would be verboten if it were applicable only to arbitration? I would say, Your Honor, trying to invoke a clearly and unmistakable standard would result in if there's any doubt, then you would find it not arbitrable. Whereas the Supreme Court has said, the United States Supreme Court, has said that all doubts move in favor of arbitrability. But in the state they said that if it's clear about that you're giving up the court forum and you're going to an arbitration forum, that's enough. That's what Evelisse said more recently. I think it's Kiernan. So, I mean, are you saying this clause is insufficient? No, I think this clause is sufficient. I don't think it's ambiguous. I think it mandates arbitration here. But to the extent there are any doubts about that, under federal common law, all those doubts should be resolved in favor of finding arbitration. But central indemnity is cited to China Minmetals. And while it talks about federal law, the very next sentence in China Minmetals talks about how in first auctions the Supreme Court held that state law was what governed. In context, weren't we reviewing what we had previously said and then what the Supreme Court has now told us as to state law governing? In first options, the issue that you're dealing with is validity. There is not a validity issue here. This is a scope issue. The scope issue is decided under federal common law and under the principles of a strong public policy. I'm sorry. Federal policy. What do you mean by scope issue? Scope is, is a particular dispute subject to arbitration. That is a different issue from, is there an agreement to arbitrate? There's no dispute that there's an agreement to arbitrate. Your adversaries say that the antitrust claim has nothing to do with the agreement, so it shouldn't be subject to arbitration. What is your response? That is a scope question because they conceded that there is an agreement to arbitrate here. That means you move into the issue of scope. But scope is decided under federal common law. But what is it about scope that includes the antitrust claim? That it relates to the underlying contract in the sense that their claim is that Remicade was overcharged. They paid more. The WAC price was higher than it should have been because of this alleged anti-competitive conduct. Under this court's case law, that is sufficient to satisfy a relation test, which as this court noted in Medtronic, is it in any way connected? Is it, is it, does it touch upon it? And I would say, given the price issues here, it certainly touches upon it. If we are to conclude that under New Jersey law, and particularly under Kernaghan, that their clear and unambiguous rule does not apply. In the context of sophisticated parties, we don't need to reach any preemption questions. That's, that's, that is certainly true. And as your honor knows, the New Jersey Supreme Court has clear, has, I would say, clearly suggested that Attalees, Garfinkel are all limited to the consumer employment context. Where I recognize the policy issues that come up here. And in those types of cases, I do think it's a slippery slope between scope and validity. And I, and frankly, I would say, I think the courts sometimes have a problem drawing that clear line of demarcation. In the case of a sophisticated party that has conceded for purposes of this appeal, that there was an agreement to arbitrate. The only issue was scope and scope. We looked under the substantive body of federal law developed under the FAA, which in this instance, requires arbitration. I see my time is up. I'm sorry. I'd like to ask a question and then we'll get you back on the go. We did not, in Moon v. Breathless, make the distinction between sophisticated and unsophisticated parties. And we would otherwise be bound to follow a prior panel as a panel ourselves. Is the language of Kernahan sufficiently clear for us to break from Moon to the extent it didn't distinguish in applying the rule? I believe it is, Your Honor. But I would also note the distinction that in Moon, this court expressly noted that the parties had said that this is governed by state law. And that took the court down the path of looking at the statutory claims here as a waiver issue, where if you look at it under federal law, the Supreme Court has said it's not a waiver issue. It is not a waiver of substantive rights. It is simply a selection of an arbitrable form instead of a judicial form. Judge Fuentes had a question. Just a quick question. So just so I understand you, to determine whether or not there's an agreement to arbitrate, we use New Jersey law. But in determining the scope of that agreement, we use federal law. Is that your argument? Yes, Your Honor. And what's your authority for that? That's different than Arthur Anderson, which specifically says that neither Section 2 or 3 of the Federal Arbitration Act disturb the background state principles for determining the scope. And I quote around the word scope. Your Honor, I understand. I would cite Century Indemnity as well as Mitsubishi. If you go back and you look at the case law, they talk about a body of substantive federal law developed under the FAA. I understand your position. Which deals with scope. I got it. Okay. Thank you. We'll have you back on rebuttal. Thank you, Your Honor. You're welcome. And we'll hear from counsel for Rochester. Good morning, Your Honors. David Sorensen of Berger Montague for RDC. We'll start with price. First, there's no price in the contract. And second, we are not alleging in our complaint that they breached any duty under the contract to charge WAC price. We are not saying that they promised to charge WAC, which is not, the price is not in the contract, which I will return. We are not saying you promised to charge WAC and you didn't. That is not the complaint. We understand that. But tell us how you would calculate your antitrust damages if you didn't draw upon WAC. We would draw upon electronic sales data, which would actually show the price that we paid. Right? We could not prove the price we paid with this contract. You couldn't go into court and say this is evidence. It's not even evidence of a purchase. It's not evidence of a price. No, but there is, but it memorializes and gives notice to the purchaser under the language that says for the purchase of this product, we're going to use the wholesale acquisition cost. And then there's language that says, and when you get notice of the change of cost, you have an obligation within some period of time to give notice of those to yourself. So how can you say this agreement doesn't give notice about the price? It has no numbers in it. That is separate. It's not evidence of the actual price paid. We're not going to prove impact or damages either individually or on a classified basis using this agreement. Could you bring an antitrust claim if you didn't have this agreement? There's no requirement in the antitrust laws. I'm asking whether you would have standing. Would you be an injured party, provincial standing for antitrust standing purposes without this agreement? We are not contesting that for purposes of this appeal. That is a factual question. The suggestion is that they would not sell without this kind of a contract. That's not something we've contested. And as a result, if they wouldn't have sold to you, you wouldn't have had injury. Therefore, since you purchased pursuant to the agreement, didn't your client suffer its injury because of the agreement? And that's just a but-for connection. And that's not sufficient. But-for. But-for seems greater, more tightly connected than just related to. So don't you fall with it? But-for, it's also related to. No, it's not because but-for has no particular connection to the complaint. The complaint does not mention disagreement. The complaint is not alleging a breach of this agreement. They could have complied completely with the agreement and we'd still have our antitrust injury. We'd still have it because we would still be alleging monopolization. We'd still be alleging that the price was. How would you calculate your damages, though? We calculate it with the data on price. We have experts analyze the but-for competitive price. And the difference is our damage on a class-wide basis. The connection that they're positing is a but-for connection that this court in Redding, citing Amran, said is not sufficient. Why? Because it has no stopping place and it has no logical nexus, analysis, connection to the complaint. They give an example of a car accident, right? They say that if two contracting parties meet in a room to sign a contract with an arbitration clause, leave the building and get into a car accident with each other, they acknowledge that although that's a but-for connection, it's not sufficient. But let's take it as a given that a simple but-for connection is not. But we're looking at, let's look to the damages issue. Why should it matter whether there's a reference to a specific price in a contract or a specific list that's attached to the contract, or the contract just makes reference to and thereby incorporates a list that's published elsewhere? Isn't that what we have here? And what's really functionally the difference? The point is our complaint, Cartier-Nett says look at the factual underpinnings of the complaint, right? You look at the clause, then you look at the factual underpinning. And what is the relationship between those two? Well, but your complaint talks repeatedly about being overcharged and damaged by paying artificially inflated prices. But not because they didn't comply with the agreement. That's not what we're saying. But the price that was incorporated into the agreement, you're alleging, was artificially inflated, right? Inflated by completely separate conduct, the biosimilar readiness plan, of which this agreement is not part of that. Our complaint is all about a wholly separate set of agreements and conduct, the biosimilar readiness plan, which they used to prevent competition. This agreement merely is a but-for conduit for purchasing. That's it. The conduct is, I understand the conduct happened independently and before. But that's just how it came to be, the price that is then being alleged to be artificially inflated. And it's that price that appears in the contract. And we're not talking about this in the abstract. And maybe you can anchor this for us in, let's assume state law. And let's assume the best guidance we have as to what the New Jersey Supreme Court would do is in epics. And epics seems to be relying on JLM and the Second Circuit's analysis there that looks at a situation almost identical to this and says it's within the scope. Well, first, New Jersey clear and unmistakable standard would apply. And then you have Moon, which sets off the three things that a arbitration clause must meet. Can you get there without the clear and unmistakable rule applying? I'm sorry? Can you get there without the clear and unmistakable rule applying? Or do you have to rely on that to move, to get away from epics and JLM? Well, first, JLM, going back to JLM. JLM was an international commerce case. Supreme Court and the Second Circuit acknowledges that in an international realm, policies favoring arbitration have a special force. That does not apply here. JLM also, at least in terms of the opinion, seemed to stress that the contracts, numerous shipping contracts, actually had numbers in it, prices in them. That's not what's going on here. JLM did not analyze in the way that we have in our brief all the case law that we've cited that looks at exactly similar arbitration clauses arising out of or relating to. But it did conclude that a claim under the Sherman Act clearly fell within the arbitration clause. In JLM. Yes. It did in JLM. Yes. And. But why was that rule? I'm sorry? I gather you, your position is that was. We think one is distinguishable because of international agreement and because it didn't do the same kind of analysis as we have here. And insofar as it's not distinct, insofar as it's similar, we think it's wrong. But assume we're not looking to Second Circuit law. We're looking to what would the New Jersey Supreme Court do? But we have two appellate division cases that are adopting that reasoning. The Supreme Court has not distinguished between business contracts and others. And the New Jersey Supreme Court has repeatedly said for an arbitration clause to cover statutory claims of any type. It has to be clear and unambiguous, clear and unmistakable. This does not meet that. That's the Supreme Court of New Jersey. There's no distinction in the types of statutory claims. And regardless of what other commentary that might have existed in other state cases, the Supreme Court has repeatedly in Adelaide and Garfinkel said, if you're going to cover statutory right and a right to sue in court, it has to be clear and unmistakable. Most recently in Kernaghan, it said that the consumer context mattered. It did not hold that it was restricted to consumers. There is language about consumers. There's no holding in that case that is restricted to consumers. I want to make sure you're speaking about the same case. Yes. Speaking of the one from 2019. Yes. Yes. Because the court seemed pretty clear what says this was the consumer context. It's the consumer context. Garfinkel made clear, also Supreme Court, predated that, that the level of sophistication of the plaintiff does not matter. That's what Garfinkel said. That's the same issue. But the New Jersey Supreme Court also said that you don't need to list every specific statutory mechanism under which you'd seek remedy. You don't have to say Clayton Act, necessarily, or Sherman Act. You have to say antitrust. You have to say antitrust? Yes. What is your authority to say that? MOON, which talked about the three part test. And the first test is it has to talk about the general subject matter, the substantive area you're covering. It doesn't have to, in MOON, it was employment. It doesn't have to necessarily have the name of the New Jersey employment statute. It has to say employment. MOON says that. So here, it could have said Sherman Act or Clayton Act. That's very specific. So you want us to ignore Canningham's basically giving us a signal, us, the collective readers of this law, saying that was the consumer context, i.e., context matters. We're going to make that make a difference. But put that aside. Let's assume we adopted your view. In order for two commercial entities to be able to enter an agreement pursuant to the type you say is required by New Jersey law or MOON, they have to list every type of possible legal theory in order to protect themselves. They have to list general subject matter areas. Yes. Employment or antitrust or discrimination. So what's covered under this clause? Two sophisticated parties enter this agreement and it says any and all controversies and claims that arise under or related to. It covers what numerous cases have analyzed that we've discussed. It covers cases where, in effect, you're alleging some kind of a breach, regardless of whether it's. Isn't that a rising under, though? Isn't that what a rising under is? Under a non-presidential opinion, a rising under requires looking at the, to interpret the contract. But then related, what does related do? Related captures a case like John Wyeth and Pennzoil, where you have John Wyeth from this circuit and the base site on Reply and Pennzoil from the Fifth Circuit.  So let's say we have this agreement between the parties and there's another agreement that does not have an arbitration clause and a preceding agreement that does not have an arbitration clause, which is like Pennzoil and like Wyeth. Well, why is the language in telling us what related to me says a logical or causal connection? That's what Wyeth says. In Wyeth, in Wyeth, what the court did and the district court did, and then this court affirmed, the district court said, we have, it is, what's going to have to happen here is we have got to interpret and construe the contract that called for payment of defense costs. Cigna promised to pay one third of defense costs for private liability litigation that Wyeth was involved in. They didn't pay. Wyeth sued. Cigna said that arises, that's subject to our formal selection clause. We go to England. The district court sending it to England said, yes, we, we are going to have to look at numerous issues essential to the case that involve the interpretation of the agreement to pay defense costs. This court affirmed on two grounds. First, it quoted the district court saying what I just said, quoting the district court saying, yes, in order to figure this out, we're going to have to go to the agreement containing the form selection clause. We're going to have to interpret it to figure out what's going on in this case. How are you going to open to the jury, assuming this is if they're, if you were going to a jury trial and describe who you are and who your client is in relationship to the defendant, Art, you're going to have to look at the agreement. No, you're not going to describe yourself as a distributor. We are going to describe ourself as a purchaser. I'm going to prove it through data. We cited numerous cases in this area. Going on your adversary is going to, you're going to make a motion and eliminate it, preclude them from making reference to the agreement. I don't know what's going to happen at trial. And how could you do that? What is your, they're going to say we're justified by charging this. Where does the invoice costs come? You're going to put a witness on the stand. You got an invoice here. Where does it come from? The wholesale acquisition agreement. How are you injured? Because it's great. I paid more than I should have. That's how I was injured. This agreement will not prove purchase and it will not prove price. As far as going at trial, we've had dozens of these kinds of cases that are going back 20 years. I personally litigated many of them. We cite many in our brief. Our motions to dismiss, our motions for summary judgment, not a single one even mentions distributor agreements. Distributor agreements are not part of these cases. That is not how they're proved. That's not how plaintiffs prove impact. It's not how they prove damages. They're simply no part of this case. And in Wyeth, not only did this court cite the district court saying we're going to have to look at this agreement and figure out what it means to figure things out. The court quoted Wyeth's own complaint saying that Wyeth, and this is at page 1074, Wyeth demanded that Cigna pay Wyeth's cost of defending the benzodiazepine litigation. But Cigna refused to pay those costs to the extent such costs exceeded the amount of the payments made by Cigna pursuant to the 1990 agreement. Could your client have been injured if it weren't a distributor? I'm sorry? Could your client have been injured if it weren't a distributor? Sure. Sure. If there are other plaintiffs who are indirect purchasers who are suing and they're also alleging damages. There's no requirement, as I mentioned, in the Sherman Act that you buy pursuant to an agreement. I understand that. And the agreement as... I'm just asking specifically your client, could your client have been injured if they weren't, if they didn't buy this product? If they didn't buy it, no, we would not. And the only reason you, and the way you can buy it is because you're a distributor, correct? And now we're back to above fork connection, which... I'm just, I'm asking you factually to do the logic trick. Isn't it true that you could only purchase because you were a distributor? Yes. Isn't that the only way you were injured is because the purchase price was higher than you thought it should be? We were injured because of a separate set of conduct that is not part of this agreement. But the conduct is what caused the pricing to go up higher than you thought it should be, correct? The conduct caused them to charge higher prices. That is what caused our injury. We're not, but the connection between that and this agreement, other than buck four, is non-existent. I understand your position. The conduct that you complain about also has to do with favored treatment with insurers and medical providers. Yes. And that favored treatment then eventually resulted in elevating the price of Remicade? Yes. But Remicade is part of the arbitration agreement, is it not? Remicade is, Remicade is in the agreement. We don't say it's subject to this particular provision. But the favored, the favored treatment of the medical providers and the insurers included favored prices of Remicade. Well, it was more, well, let me take a step back. What we're alleging more is that they. Maybe you can clarify that, but it seemed to include the subject of the arbitration clause. No, they were contracting, that is the defendants were contracting with separate contracts with insurers and providers to keep other products out. That's how this biosimilar plan works. You buy Remicade from us, but don't buy competing products from others with various provisions in that to prevent the providers and insurers from utilizing other drugs. By what those products were? Did it specify the underlying? Our complaint does not get into that level of detail in terms of the contracts. I want to make one thing clear. We are saying that this is an issue of enforceability, not just scope. Attlees says that if you're not meeting the clear and unmistakable standard, the provision is unenforceable. Not just that the scope is, it's not just a scope issue, but whether it's enforceability or scope. Did you make that argument in your brief? Yes, we did. And what did you rely on for that point? Attlees says it's an enforceability issue. Where did you argue in your brief that we're looking at step one, not simply scope? I'm sorry? Where in your brief do you argue that we're looking at step one in the arbitration analysis? We're not simply looking at scope. I took your brief to actually be focusing on scope. We say it's an issue of enforceability in our brief. And we say, we raise it as an issue of enforceability below and we raise it in our brief to this court. Attlees says clear and unmistakable goes to enforceability, not just scope. And that's how we brief it. And we said, or you can look at it as a scope question. The same, we end up in the same place. But we did raise it as an enforceability issue. For those, well, maybe we're talking about different things. Typically, there's a first step of looking at the validity of the agreement. Is that what you're calling enforceability? Or enforceability is just, it's actually in the scope of the agreement and therefore you can enforce it? Enforceability, if this agreement is construed to cover our antitrust claims, it's unenforceable. In that sense, it would go to validity, yes. And under Attlees, that's exactly how it's analyzed. And we did make that argument. We make that argument in this brief. But even if it's not just an issue of scope, we still win because as this court explained and why, and there's numerous cases that we cite, explain, we cited the Ford case, Pennzoil, NCR court, Allied Signal, which was a pricing antitrust case, where the court said these antitrust claims are alleging inflated prices. They're not within the scope of this arbitration clause because the defendant could comply and charge the prices it was supposed to and you still get injured. If we conclude that the clear and unmistakable rule applies here, then we would need to reach the preemption question, right? Yes. Yes. And. But it's not preempted. So you may be aware a couple of weeks ago that the New Jersey Supreme Court granted cert in SCSI versus Pfizer, where it appears that one of the questions will be preemption of that rule under the FAA. If we are to get that far in our own analysis, do you agree we should be holding the case CAV for the decision from the New Jersey Supreme Court on that point? Or do you think it's sufficiently clear currently in New Jersey case law? Your Honor, I'm not up on that particular granting of cert. My apologies. So but if, as you described it, it would certainly seem to be something you'd want to wait for if you get that far in the analysis. I don't think you need to get that far. Even if you got around the general applicability requirement in kindred nursing, what about LAMP plus? LAMP plus says consent is key. That underlying arbitration is making sure that the parties who are being sent for arbitration, and in this case being sent there over our objection, being deprived of the ability to go to court, are consenting. The clear and unmistakable standard is about ensuring consent. That's what it's doing. I do not see how a New Jersey doctrine that is trying to ensure consent can be at odds with federal arbitration law that even in the most recent Supreme Court case that they submitted says consent is essential. I think those mesh together perfectly. New Jersey is actually furthering that goal. So in that sense, I don't think there's any preemption or any conflict. If the guiding principle is consent, wouldn't that take us right back to why the clear and unmistakable rule should not be applying to sophisticated parties who don't need specific statutes and causes of action spelled out to consent when they agree to a very broadly worded arbitration clause? Well, Your Honor, again, whether you're a business, as in flag house, a panel of this court decided flag house, those are two businesses, whether you're a business or not. If you're being deprived of your ability to go to court, it's not onerous to ask the people drafting these agreements to make it clear that you are losing your right to go to court under statutory claims. That is only an onerous requirement. If you look at this agreement, though, this agreement has a clause that talks about the waiver of the jury trial, right? Yes. It all caps and in the lines before it, it sets forth a number of damages that are being given up by the parties, including the types of damages one can get in antitrust cases like multipliers. Why isn't that enough notice to say, look, you can go dispute your, bring your dispute outside of a court. You can't have a jury and you can't be in court and you're going to give up certain remedies. Why isn't that also sufficient to telegraph to us, to the parties to this agreement, what you're giving up? No, my time is up. I can't answer that question. Thank you. Your Honor, we briefed this below and in this court and the district court analyzed this, that the scope section of the arbitration provision is 4.21. After that, you've left scope behind and you're moving on to procedural issues like deadlines and discovery and choice of law and other matters. So scope is in one place. And then when you get to the later portions of 4.21, which you're alluding to, it's saying four claims that go to arbitration, whatever subset of claims, then the arbitrator's discretion to, that he otherwise might have in New Jersey common law to award various types of damages is removed except required by statute. So if you have a breach of contract claim and associated business torts, which you might be able to get not just straight damages, but punitives or attorney's fees, as we outlined in the brief, under New Jersey common law. This clause is saying, well, no, no, no. You're in arbitration for a breach of contract and some associated conduct. But this clause is telling the parties, but you don't get the benefit of New Jersey common law for those types of damages. But you get statutory relief and that's what it's telling you. So why aren't you on, why isn't your client on notice? Except for as required by statute in New Jersey statutes where like pre-adjustment interest, it would be required. That's all that's doing. It's not opening up the scope. The scope is limited very tightly to claims relating to the agreement. Our position is we're over here, you're over here. So within the box of limited claims that are directly related to the contract, then these other provisions apply. We briefed that below. We briefed it here. And on reply, the defendants took no issue with that. We laid this out in our brief and on their reply brief, they said nothing about this. Well, since I haven't even said that, I'm rebuttal. Do you mind showing me if you have any more questions? That would be the first time I'd hear anything about it. Okay, then we'll learn together, perhaps, as Judge Debevoise used to say to all of us. Okay. Anything else? Thank you. Thank you for your argument. Your Honor, the arbitration, the agreement permits an arbitrator to award statutory damages such as those damages recoverable under the Sherman Act, which presumably would include the trebling of damages. There is a specific reference there. There's a consistency to this agreement. There's the requirement to comply with federal law. There's nothing to suggest that statutory claims have in any way been read out of a broad arbitration provision that encompasses any claim. So are you saying that the clause that I was just speaking with your adversary about provides notice that, in fact, it's in the arbitration? Yes, it does. Including the Sherman Act? Including the Sherman Act, it's statutory damages. Specifically referenced in the arbitration agreement? No, the Sherman Act is not specifically referenced, and that goes back to Judge Swartz's question, that with sophisticated parties, we're going to list every potential federal statute that could be a claim or controversy. Sophisticated parties understand any claim or controversy means any claim or controversy relating to or arising from. That seems like a rather remarkable proposition, that a contract could have an arbitration clause that sets forth the scope of arbitration, and then later provisions that are addressing how those claims should be handled are going to be read back to expand the scope of arbitration? No, I think the only thing it did, the only thing the phrase statutory damages makes clear is that within the context of arbitration, statutory damages are permissible. It's giving the arbitrator that right. Much more logical reading that it relates to things that are authorized by statute in terms of damages. It's in the damages section, talking about punitives and other damages that may be authorized by statute. And I would say, Your Honor, it would apply in the arbitration context, because it provides that if there is a claim or controversy that arises or relates to the contract, the arbitrator has the right to apply statutory damages. So you're not arguing that we need to rely on that provision? No, I'm not, Your Honor. I'm simply saying that it is relevant to arbitration. I don't think it defines what the scope is. Just what you asked a question about, Arthur Anderson, I would note that Arthur Anderson cites Moses Cohen, which states the Arbitration Act establishes that as a matter of federal law, any doubts concerning the scope of arbitration issues should be resolved in favor of arbitration. Again, relating to federal law dictates scope. And the issue of doubt is what's problematic with applying a clear and unmistakable standard. If you're saying it's clear and unmistakable, you're saying, well, doubts are then resolved against arbitration. But that's contrary to federal law. And finally, I would say the entire argument we heard about enforceability, that is a validity issue. And as the district court said, you know, Rochester agrees that there is a valid agreement to arbitrate. The only issue here is scope. And the Supreme Court has noted that courts should be watchful of efforts to try to use a validity argument to really undermine what is truly a scope issue. Is it significant, Mr. Kavanaugh, that the anti-competitive conduct that is claimed about involved not just Remicade, but two other drugs that were not purchased directly from Johnson & Johnson? No, Your Honor, because as I indicated, the claim here is that Remicade had a 90% market share and that it is the price of Remicade that was overcharged. I think those minimal purchases, because their argument is there were minimal purchases of the biosimilars because of the anti-competitive conduct. But they were not purchased from Johnson & Johnson? No, Your Honor, they would not. I do think... Why wouldn't that take it out of the arbitration agreement? Your Honor, they could make the argument that the purchases from Merck and Pfizer might take you outside of the scope of the arbitration claim. It can't, under any circumstances, take the Remicade purchases out. You do come to a question of what's the efficiency here and does it make sense to resolve those issues in two distinct forums. So you're basically saying you can go ahead and take these matters out of arbitration as long as you don't include Remicade? You can't include Remicade. And I do think that given that all of this deals with conduct relating to Remicade, which they say have hurt the biosimilars, you can make, I think, a very credible argument that those purchases still relate to this agreement. But as to Remicade, there's no question, they are clearly arbitrators. Counselor, are you familiar with the SCSI case? The New Jersey Supreme Court grand jury... Your Honor, I have to share my friend's ignorance. I'm not. I do think you don't need to reach that issue because I think you can take New Jersey Supreme Court's admonition that these cases, these line of cases, Garfinkel, Adelaide and even Moon, are dealing with the employment context. And you avoid what I think is a strong preemption argument that trying to apply waiver concepts involving clear and unmistakable waivers in the context of scope of arbitration provisions does run contrary to the FAA and federal law and is preempted. But I don't think you need to go there because, again, in Moon, the party stipulated that it was state law, which led the court to the entire discussion of Garfinkel and Adelaide's dealing with waiver. But here, given the cases we've cited, going back to Moses Cohen, scope is a question of federal law. Thank you very much. Thank you very much. We thank both counsel for excellent briefs and helpful arguments and the court will take the matter under advisement.